**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HORACE A. TRENT, III,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   20-cv-4237** |
| | : | |
| **KILOLO KIJAKAZI,[1]** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                   **March 23, 2022**

Plaintiff Horace A. Trent, III, brought this action seeking review of the Commissioner of

Social Security Administration's (Commissioner) decision denying his claim for Social Security

Disability Insurance (SSDI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–

433.  This matter is before me for disposition upon consent of the parties.  For the reasons set

forth below, Plaintiff's Request for Review (ECF No. 16) is **DENIED**.

**I.      PROCEDURAL HISTORY**

Plaintiff protectively filed for SSDI, alleging disability since January 31, 2014, due to

post-traumatic stress disorder (PTSD), diabetes, obesity, high blood pressure, major depressive

disorder without psychotic episodes, anxiety, compassion fatigue, rage, anger outbursts and

blackouts with memory loss and headaches.  (R. 412).  Plaintiff's application was denied at the

initial level, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R.

---

[1]  Kilolo Kijakazi became the Acting Commissioner of the Social Security
Administration on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), I have
substituted her as the defendant in this lawsuit.

184-93).  Plaintiff, represented by counsel, and a vocational expert (VE) testified at the February 15, 2019 administrative hearing.  (R. 71-121).  On April 19, 2019, the ALJ issued a decision unfavorable to Plaintiff.  (R. 24-45).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on June 29, 2020, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-7).

On August 28, 2020, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On October 2, 2020, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). (Consent Order, ECF No. 5).  On May 21, 2021, Plaintiff filed a Brief in Support of His Complaint for Review of Social Security Decision, which he amended on May 24, 2021.  (Pl.'s Br., ECF No. 15; Pl.'s Am. Br., ECF No. 16).  On June 23, 2021, the Commissioner filed a Response.  (Resp., ECF No. 17).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record[2] and summarizes the evidence relevant to the instant request for review.  (R. 39).  Plaintiff completed four or more years of college and a graduate degree.  (R. 413, 994).  He also previously worked as a program and services coordinator for a school district and a management analyst for a state social services department.  (R. 414).

---

[2]  The administrative record includes the file from Plaintiff's prior claim, which was denied on June 12, 2015.  (R. 122-51, 174-83, 250-386, 405-08, 456-639).  Because this claim is not being reopened, the ALJ considered the prior evidence for background purposes only.  (R. 27).  The Court does likewise here and therefore does not summarize it, except as necessary for this purpose.  In addition, the record includes post-hearing evidence submitted to the Appeals Council only.  (R. 9-10, 447-55).  Because the Court finds, as set forth in Section V.B.2, that this evidence was not properly before the Council, it does not summarize it here.

A. **Medical Evidence**[3]

Plaintiff presented to his new primary care physician, Eric Palecek, M.D., at PennCare

Internal Medicine in January 2014 complaining of headaches, visual interruptions and blackouts

related to work stress.  (R. 836-41).  He reported that the headaches occurred four to five times

per day and lasted from three to 45 minutes (with longer ones being less intense), that the visual

interruptions occurred three times per day and included a pulsing head, and that the blackouts

lasted up to an hour.  (R. 836).  At his February 2014 visit, he reported that he had stopped

working, that the visual interruptions had ceased, and that the blackouts and headaches were

improving, with the latter occurring only "now and then" and lasting only five minutes.  (R. 833-

34).  Plaintiff also expressed concerns about dissociative issues and PTSD.  (R. 830-34).  The

notes for each subsequent month's visit indicate continued improvement, with no relevant

symptoms by September 2014, although Plaintiff was diagnosed with rage attacks, excessive

anger and stressful workplace during this period, in addition to a pre-existing anxiety diagnosis.

(R. 810-30).  In October 2014, he told Dr. Palecek that his therapist had diagnosed him with

compassion fatigue.  (R. 806).  During this period, he attended outpatient therapy and anger

management classes and saw a psychiatrist, although he declined medication.  (R. 802-30).  He

also lifted weights regularly and spent four to five hours per day writing for his religious

organization.  (R. 806, 810, 813, 815, 817).  By the end of 2014, Plaintiff was experiencing only

occasional symptoms.  (R. 802).

In 2015, Plaintiff reported only a single episode of "feeling worked up/frustrated" while

watching the news in January and a single panic attack, with a resulting inability to do any work

---

[3]  Plaintiff's Request for Review does not concern the ALJ's findings regarding his
diabetes, obesity and high blood pressure.  Accordingly, the Court will not address these
conditions.

and with feeling his pulse in his ears, while working on his doctoral studies in February.  (R. 794, 798).  His May 2015 treatment notes from Dr. Palecek indicate that Plaintiff had stopped exercising but that his symptoms were "much improved," with no headaches, visual interruptions, or blackouts.  (R. 790).  By November 2015, Plaintiff was "busy with graduate studies, reading 8-10 chapters per week," which was also purportedly why he had stopped exercising.  (R. 782).  As of February 2016, Plaintiff was "working really hard" on a grant, attending doctoral classes, and applying for a new job.  (R. 778-79).  He resumed exercise briefly – biking for 45 minutes five times per week – but had stopped again by December due to a "rough semester."  (R. 768, 770).  Plaintiff started exercising again in 2017, increasing to six times per week by June.  (R. 752, 757, 762).  By that point, he also completed his coursework and examinations for his doctoral program and was ready to begin writing his dissertation.  (R. 752).  He reported no relevant symptoms to Dr. Palecek in 2016 or the first half of 2017.  (R. 752-81).

In September 2017, Plaintiff reported "a few blackout episodes" related to contact with his previous employer.  (R. 750).  He also stated that he was exercising daily or almost daily, which continued through his March 2018 visit.  (R. 748, 931-32, 934).  At his April 2018 visit, he reported back pain, originally stemming from childhood abuse, that had "flared up" recently but that was not present with exercise.  (R. 941).  Dr. Palecek noted that he "suspect[ed] mechanical low back pain" but with "no red flags."  (R. 942).  Plaintiff further complained that he had tingling in both arms, positional in nature and worse when raising his arms or carrying something heavy, but that the sensation would improve with lowering his arms or moving the heavy item to his other hand.  (R. 941).  His examination showed no signs of weakness in his arms or grip strength.  (R. 942-43).  In June 2018, Plaintiff was diagnosed with bilateral carpel tunnel after tests revealed "moderate bilateral neuropathy at the wrist, otherwise normal."  (R.

4

944, 948, 951).  He was also diagnosed with lumbar degenerative disc disease.  (R. 948).  Dr. Palecek prescribed physical therapy for both conditions, as well as elastic wrist stabilizers for the carpel tunnel.  (R. 956).  Plaintiff reported exercising less at this time due to working on his dissertation.  (R. 951).  However, he further reported visiting a therapist weekly, "no more blackouts," and feeling "like mentally he's in a good place now."  (R. 952).

Plaintiff attended approximately five physical therapy sessions at NovaCare Rehabilitation in August 2018.  (R. 974-85).  At the intake visit, he told the therapist that he could walk and climb stairs without pain "until returning home" but that he no longer carries heavy bags or briefcases.  (R. 974).  He stated that prolonged sitting makes his back stiff.  (*Id.*) He reported that although his pain had worsened over the last one and a half years, prior physical therapy had diminished it.  (*Id.*).  Throughout the course of treatment, Plaintiff continually improved, "noting marked decrease in pain and difficulty related to activity performance."  (R. 985).

In addition to Dr. Palecek and a physical therapist, Plaintiff also treated weekly with Jonathan Smith, a psychologist at the Military Family Clinic at the University of Pennsylvania, from February to August 2018.[4]  (R. 987-1122).  He began treatment due to a school shooting causing him to think about his old job and his PTSD stemming from his childhood abuse.  (R. 991).  At his initial visit on February 28, 2018, he described "up and down" concentration, a "generally . . . okay" memory, low energy, and diminished but still moderate self-esteem and motivation.  (R. 992).  Plaintiff recalled prior instances from January 2014 in which, after disagreements with his then-supervisor, he "was ready to twist his neck" or would drive to a

---

[4]  Plaintiff also attended "booster sessions" with Smith on November 9, 2018, and January 14, 2019, but it does not appear that any records from these sessions were submitted. (R. 1158).

location without remembering doing so.  (*Id.*).  He indicated he still has homicidal ideation about

his former supervisor but without any imminent intent and contingent upon learning that his

supervisor was hurting someone.  (R. 996).  He further recalled "passing out" for four to five

hours after coming home from a job interview in March 2016 and for three to four hours each

day after helping a friend review financial records in May 2017.  (R. 992).  He reported taking

care of his 19-year-old nephew since he was three.  (R. 994). Dr. Smith observed that Plaintiff

was irritable but that he gave relevant responses and had normal thought processes and speech,

good insight and fair judgment.  (R. 997).

At his March 2018 visits, Plaintiff reported focusing on caring for his nephew and

exercising.  (R. 1009).  All thoughts of hurting others were tied to situations in which it would be

necessary to protect himself.  (R. 1019).  During these visits, his mood varied from irritable to

euthymic to anxious, and his thought processes varied from logical and coherent to

circumstantial and nondescript.  (R. 1003-19).  In April 2018, Plaintiff reported that his

worksheet exercises were "somewhat helpful."  (R. 1039, 1044).  His mood varied similar to the

prior month, although at times his thought processes evidenced rigidity and problematic patterns

but at other times an increase in relevance and decline in tangentiality.  (R. 1020-44).  In May

2018, Plaintiff reported concentration difficulties between sessions and persistent anger based on

the feeling that he must advocate for change and cannot decline requests to help, as well as anger

from an encounter with his family.  (R. 1049, 1054).  His mood remained irritable, and his

thought processes were occasionally rigid and often circumstantial.  (R. 1064).

Plaintiff reported two blackouts on consecutive days in June 2018.  (R. 1069).  He again

described his worksheet exercises as "somewhat helpful" but expressed concern that his anger,

anxiety and depression were not improving.  (*Id.*).  However, he subsequently reported a

reduction in anger and frustration through cognitive change exercises and successfully managed

the unexpected attendance of another family member at his nephew's high school graduation. (*Id.*).  Throughout the month, he continued to be irritable and demonstrated "problematic" thought processes.  (R. 1069, 1074, 1079).  He began July with "a better week overall" and reported focusing his attention on his dissertation, his nephew, and physical exercise throughout the month, despite continued stress from the news and his volunteering as a board member.  (R. 1084, 1089).  His mood improved from mildly irritable to euthymic, with a decrease in unwanted and aggressive thoughts and feelings.  (R. 1089, 1100).  He reported benefiting from focusing on living out his personal values, and Dr. Smith noted that he was "trending toward improvement" since switching the type of cognitive therapy used.  (R. 1100).

At Plaintiff's first August 2018 visit, he reported struggling with anger during an emergency board meeting, which led to a recurrence of homicidal ideation, albeit with a continued lack of intent to act on such thoughts.  (R. 1105).  His therapy exercises showed mixed results, with "limited benefit" from some but "demonstrated improvement in both intensity of distress as well as successful engagement in his committed action" from others.  (*Id.*).  At his next visit the exercise results "demonstrated an ability to cope with unwanted thoughts, feeling, and memories" in the physical health and education areas but "increased struggle and decreased engagement" in the community area.  (R. 1110).  The results were similar at the ensuing visit, although they demonstrated that he "had engaged in valued activity in the community domain where he ha[d] been exhibiting significant distress and struggle."  (R. 1115).  Plaintiff raised the possibility of resigning from his board position.  (*Id.*).  He returned to this possibility at his final visit, explaining that the time he spends on board-related activities increases his aggravation and takes time away from more valued areas.  (R. 1120).  Nonetheless, he reported that he "successfully limited engagement" with the other board members.  (*Id.*).  His worksheet responses also showed "improved ability to defuse from unwanted thoughts, feelings, and

memories[,] and he reported enhanced quality" of actions taken regarding his physical health and learning goals.  (R. 1120).  During the August visits, Plaintiff was irritable and demonstrated problematic thought processes, including illogicality, circumstantial reasoning, grandiosity, perseveration and cognitive fusion.  (R. 1105, 1110, 1115, 1120).

Plaintiff was also examined by consultative physician, David Dzurinko, M.D., and consultative psychologist, Michael Wright, Ph.D., on October 5, 2017.  Plaintiff reported to Dr. Dzurinko that he has occasional stress-related memory loss and blurred vision and that, under "intense stress," he "blacks out" "then require[s] a long episode of sleep which he describes as just blacking out and not remembering things."  (R. 867-68).  Dr. Dzurinko observed that Plaintiff "becomes startled when he has done things that he does not remember, since he is expecting to remember everything."  (R. 868).  Plaintiff also reported headaches, sometimes reaching maximum intensity but generally improving with rest.  (*Id.*).  He was able to do household chores, care for his nephew, shop and engage in personal care.  (R. 869).  In the examination room, he could walk on his heels and toes without difficulty, squat fully, and get in and out of the chair and examination table on his own.  (*Id.*).  Dr. Dzurinko recorded Plaintiff's prognosis as fair.  (*Id.*).

Dr. Dzurinko opined that Plaintiff could frequently lift and carry up to 50 pounds and occasionally up to 100 pounds, sit/stand/walk for up to 8 hours consecutively, continuously use both hands for reaching and fine motor movements and both feet to operate controls, and frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.  (R. 872-75).  He indicated that Plaintiff could also frequently tolerate exposure to moving mechanical parts, humidity and wetness, odors and pulmonary irritants, extreme temperatures and vibrations and noise.  (R. 876).  Dr. Dzurinko found that Plaintiff could shop, prepare simple meals, care for himself, handle papers and files, travel unaccompanied (including on public transportation) and

ambulate without assistance at a reasonable pace (including on rough or uneven surfaces).
According to Dr. Dzurinko, due to Plaintiff's blackouts, he could never climb ladders or
scaffolds, tolerate exposure to unprotected heights, or operate a motor vehicle.  (R. 875-76).
Plaintiff's range of motion for various body parts was within normal limits and his visual
impairments did not limit his ability to avoid workplace hazards, read books/newspapers or very
small print, view a computer screen, or distinguish the shape and color of small objects.  (R. 875,
88-79).

Plaintiff reported to Wright depression symptoms of poor sleep, dysphoric mood, loss of
interest, concentration difficulties and social withdrawal; anxiety symptoms of restlessness,
difficulty concentrating, avoidance of social settings, irritability, and excessive apprehension;
and cognitive symptoms of short-term memory deficits and some organizational difficulties.  (R.
859-60).  Plaintiff also reported a hyperstartle response, feelings of detachment, anger outbursts,
avoidance and "blackouts that he described as periods of disassociation and inability to
concentrate."  (*Id.*).  Wright recorded that Plaintiff's mood and affect were anxious, that his
memory was impaired due to anxiety and related emotional distress, that his thought process was
circumstantial and somewhat tangential, and that he required interruption and redirection several
times.  (R. 860-61).  However, his attention and concentration were intact, he showed fair insight
and good judgment, and he demonstrated average to above average intellectual functioning with
an appropriate fund of information.  (R. 861).  Wright regarded Plaintiff's prognosis as fair.  (R.
862).

Wright found that Plaintiff had mild restrictions in understanding, remembering and
carrying out simple instructions; making judgments on simple work-related decisions; interacting
appropriately with the public, supervisors and coworkers; and responding appropriately to usual
work situations and to changes in a routine work setting.  (R. 863-64).  According to Wright,

Plaintiff had moderate restrictions in understanding, remembering and carrying out complex instructions and making judgments on complex work-related decisions. (R. 863). Wright based these restrictions on Plaintiff's memory impairments, anxiety symptoms, distractability and circumstantial speech. (R. 864).

Later in October 2017, the state agency consultants provided their opinions. Medical consultant Antone Raymundo, M.D., opined that Plaintiff could occasionally lift and carry up to 50 pounds and frequently up to 25 pounds; push and pull without additional limitations; stand/sit/walk for six hours per workday; frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and occasionally climb ladders, ropes and scaffolds. (R. 165). He found that Plaintiff had no limitations regarding manipulations, vision, communication, extreme temperatures, wetness and humidity, noise and vibration, or fumes, odors, dusts, gases, and ventilation. (R. 166). However, Plaintiff should avoid concentrated exposure to hazards like machinery and heights, according to Dr. Raymundo. (R. 166). Plaintiff reported that he was able to engage in personal care, household chores and repairs, bug extermination, shop, pay bills, and drive. (R. 167). He stated that he could walk for two to three miles before needing to stop to rest for 10 minutes before resuming walking. (*Id.*).

Psychological consultant Valerie Rings, Psy.D., opined that Plaintiff had no significant limitations regarding adaptations, social interactions, understanding and memory, carrying out short and simple or detailed instructions, maintaining attention and concentration for extended periods, performing activities pursuant to a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, or making simple work-related decisions. (R. 168-69). She found that Plaintiff had moderate limitations in his ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 169).  According to her, Plaintiff "is able to meet the basic mental demands of competitive task on a sustained basis despite the limitations resulting from his impairment."  (*Id.*).

> ### B.     Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated September 5, 2017, Plaintiff claimed that when interacting with others "on projects, operations, lessons, curricula, or troubleshooting budgets, projects, research or proposals" his conditions cause him to have headaches, memory lapses, thumping in his ears and angry thoughts and to lose consciousness.  (R. 420).  He reporting engaging in personal care, meditating and praying, riding his spin bike, taking walks, watching television, preparing and eating meals, checking emails, making phone calls, applying for work, interviewing, conducting research, designing projects and proposals, studying, writing papers and religious treatises, caring for his nephew, carrying out routine household chores and repairs, shopping weekly, using public transportation, driving when he rents or borrows a car, and managing his finances.  (R. 421-24).  He stated that his symptoms cause him to experience sleeping difficulties but do not interfere with his personal care, except when they are "overbearing" he will not shower or get dressed unless he "need[s] to go somewhere," in which case he will "force [him]self to get it together."  (R. 421).  He indicated that he uses his iPhone and a desk calendar for routine reminders because otherwise he "may forget or have memory loss."  (R. 422).  He reported not going near large groups "too often" and socializing only with close friends and fellow worshippers.  (*Id.* at 424-25).

Plaintiff checked boxes on the form indicating various difficulties, including with memory, concentration, following instructions and getting along with others.  (R. 425).  He explained that he does not remember creating reminders sometimes, that he must put tasks aside

to complete them later, that he will not complete instructions that do not make sense to him, and that he will limit exposure to others to avoid anger incidents.  (*Id.*).  He indicated that he can pay attention to "intelligent things" for three hours but only 20 seconds to "dumb stuff."  (*Id.*).  He further stated that he can follow written instructions "very well" unless the person giving them is "causing issues" and that he follows spoken instructions "usually okay" unless they come from a "dumb individual" or are for a project that "makes no sense or is being delegated incorrectly." (*Id.*).  He reported not getting along with authority figures unless they are friends and not handling stress well but that he could handle changes in routine if he "like[d] and appreciate[d] the routine."  (R. 426).  He noted past headaches, blackouts, bouts of anger and slight blurred vision during or following interviews and when working on volunteer or group projects, helping "obnoxious colleagues," or receiving instructions from people with "racial, gender, ethnicity, or other issues."  (R. 427).  Plaintiff claimed to have a low "tolerance threshold" for "most people," especially authority figures and groups.  (*Id.*).

At the February 15, 2019 administrative hearing, Plaintiff testified that he attempted to return to work in 2015 at Goodwill as a grant analyst but only lasted one and a half days before nearly passing out. (R. 84).  Prior to that, he had worked as a services coordinator from 2013 to 2014 but stopped after anger outbursts, blurred vision and bouts of memory loss, including forgetting driving places and writing reports.  (R. 98-99).  Plaintiff explained that his prior jobs had been "very high intensity" and that symptoms were brought on by "working very diligently" at a deadline.  (R. 103).  He recounted the incident in which he "was about a second away from breaking [his former supervisor's] neck" and another in 2015 when he "blacked out" during an altercation with another college student.  (R. 103-04).  He testified to requiring extra time for projects relating to his doctorate and being approximately a year and a half behind in his studies, apparently due to "pass[ing] out" for four hours after studying for two hours.  (R. 105).

12

Nonetheless, he indicated that he had completed his classes.  (*Id.*).

From February 2014 to February 2015, Plaintiff attended group and then individual therapy.  (R. 99-100).  He did not take any medications for his mental health issues during this period because his psychiatrist told him he "wasn't to that point yet."  (R. 100).  Plaintiff further testified that he had never taken psychiatric medications and that he was waiting to see if his psychotherapies worked instead.  (*Id.*).

### III.   ALJ'S DECISION

Following the administrative hearing held on February 15, 2019, the ALJ issued a decision in which he made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since January 13, 2014, the alleged onset date.

3. The claimant has the following severe impairments: headaches, obesity, affective disorder, anxiety disorder, personality disorder and post-traumatic stress disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except that he can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  He can never climb ladders, ropes, or scaffolds.  The claimant must avoid frequent exposure to hazards including

13

moving machinery and unprotected heights.  He is limited to unskilled work with routine and repetitive tasks performed in a low-stress environment (defined as no frequent changes in the work setting) with no public interaction and occasional interaction with co-workers and supervisors.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on December 2, 1967, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advancing age.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2014, through the date of this decision.

(R. 24-45).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 41).


IV.    **LEGAL STANDARD**

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform her past work.  If the
> claimant cannot perform her past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a

reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the

decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal

issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).


V.     **DISCUSSION**

        In his request for review, Plaintiff raises three claims: (1) that his impairments satisfy the

established criteria of the relevant listings; (2) that the ALJ erred in determining that Plaintiff had

the RFC to perform medium work; and (3) that the ALJ erred by crediting inconsistent expert

opinions.[5]  (Pl.'s Am. Br., ECF No. 16, at 9-17).

        A.     **Listings at Step Three**

        Plaintiff contends that substantial evidence does not support the ALJ's step three

determination that his mental impairment did not meet or equal Listing 12.04 (depressive,

bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders) or

Listing 12.15 (trauma- and stressor-related disorders).  (Pl.'s Br., ECF No. 16, at 9-12).  The

_____

        [5]  These three substantive claims set forth as headings in the Argument section of
Plaintiff's brief do not exactly match the eight errors alleged in his Statement of Errors.
(*Compare* Pl.'s Am. Br., ECF No. 16, at § 2, *with id.* at § 3.B-D).  However, upon closer review,
most of the alleged errors are addressed in the substantive arguments raised in the former section.
(*See* Pl.'s Am. Br., ECF No. 16, at § 3.B (addressing Error numbers 1 and 3), 3.C (addressing
Error numbers 4 and 7), 3.D (addressing Error numbers 5, 6 and 8)).  Plaintiff failed to make any
supporting argument only as to Error number 2, that "[t]he ALJ erred in finding that Plaintiff did
not meet the status requirements of sections 216(i) and 223 of the Social Security Act." (*Id.* at
7).  In fact, the ALJ found that Plaintiff **did** meet the status requirements, albeit only through
December 31, 2019.  (R. 29).  In any event, because the Court finds that the ALJ's decision that
Plaintiff is not disabled is supported by substantial evidence, it is unnecessary to consider
Plaintiff's unsubstantiated assertion that he met the status requirements past that date.

Commissioner counters that the ALJ properly concluded that Plaintiff did not meet the criteria for Listings 12.04, 12.06 and 12.15 and that substantial evidence supports that conclusion. (Resp., ECF No. 17, at 7-13).  The Court finds the Commissioner's arguments persuasive.

At step three, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings that prevent an adult, regardless of age, education, or work experience, from performing any gainful activity.  20 C.F.R. §§ 404.1525(a), 416.925(a).  This inquiry functions to identify those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background, making further inquiry unnecessary.  *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990).  The claimant bears the burden of producing medical findings showing her impairments meet or medically equal a listed impairment.  *See Burnett*, 220 F.3d at 120 n.2.  To meet this burden, the claimant must establish all the requirements of the relevant listing.  *Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify"); *see also Hartung v. Colvin*, No. 12-6155, 2016 WL 2910096, at *5 (E.D. Pa. May 19, 2016).  Meeting a listing cannot be based on diagnoses alone.  20 C.F.R. §§ 404.1525(d) and 416.925(d).  Because matching or equaling a listing at step three results in an automatic finding of disability, the listings are strictly construed against claimants.  *See Sullivan*, 493 U.S. at 530-32.

Here, the ALJ identified Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders) and 12.15 (trauma- and stressor-related disorders) as relevant to Plaintiff's mental health impairments, but, considering the criteria of paragraph "B," found his impairments were not severe enough to meet the listing.  (R. 31).  Under paragraph "B," one extreme or two marked limitations must be found in the following areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself.  20 C.F.R.

Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B), 12.15(B).  A "marked limitation" means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(d).  The ALJ determined that Plaintiff had: (1) a mild limitation in understanding, remembering, or applying information; (2) a moderate limitation in interacting with others; (3) a moderate limitation in concentrating, persisting or maintaining pace; and (4) a mild limitation in adapting or managing herself.  (R. 31-32).  Because Plaintiff's impairments did not cause "at least two 'marked' limitations or one 'extreme' limitation," the ALJ concluded that the paragraph "B" criteria were not satisfied.  (R. 32).

Substantial evidence supports the ALJ's determination that Plaintiff did not meet or equal Listing 12.04, Listing 12.06, or Listing 12.15.  With respect to the ALJ's conclusion that Plaintiff has a mild limitation in understanding, remembering, or applying information, the record evidence relied on by the ALJ supports this conclusion.  The ALJ specifically acknowledged Plaintiff's blackouts, short-term memory deficits, organizational difficulties, anxiety and related emotional distress but nonetheless concluded that they imposed "no related functional limitations."  (R. 31, 39).  In making this determination, he pointed to Plaintiff's September 2017 Adult Function Report in which he stated that he can follow written instructions "very well" and oral instructions "usually okay," unless, in his view, they are nonsensical or given by a "dumb individual" or pertain to an improperly delegated task.  (R. 31, 425).  The ALJ also noted Plaintiff's mental examination results showing average to above-average intellectual functioning, an appropriate fund of information and that Plaintiff could recall three of three objects immediately, two of three after a delay, and six digits forward and four backward.  (R. 31, 861-

62).  Overall, this evidence supports the ALJ's finding of only mild limitation in understanding, remembering or applying information.[6]  (R. 31).

   As for interacting with others, substantial evidence supports finding a moderate limitation because, as the ALJ noted, Plaintiff maintains positive social relationships with some relatives, close friends and fellow worshippers and speaks occasionally to his priest.  (R. 32, 424-25, 861-62).  As the ALJ further observed, although the consultative psychologist had some difficulty engaging with Plaintiff, Plaintiff was cooperative and friendly, and his manner of relating and social skills were fair.  (R. 32, 860).  With regard to concentration, persistence, and maintaining pace, the ALJ determined that Plaintiff has a moderate limitation.[7]  Substantial evidence supports this finding.  Plaintiff has been able to complete the coursework and examinations for his doctorate in education and reported focusing on writing his dissertation, as the ALJ repeatedly observed.  (R. 32-34, 36, 752, 951).  Plaintiff attempts to discount the functioning required to achieve these feats by noting that his studies have caused him to shake and pass out and that he has required additional time to complete coursework, but the fact remains that he has made substantial progress nonetheless.  (*See* Pl.'s Br., ECF No. 16, at 10-11).  Further, the ALJ "considered the claimant's moderate limitations in . . . concentrating, persisting, or maintaining pace . . . by limiting the claimant to unskilled work with routine, repetitive tasks performed in a low-stress environment (defined as no frequent changes in the work setting) with no public

---

   [6]  Plaintiff observes that Dr. Palecek checked a box on a Pennsylvania Department of Public Welfare Employability Re-assessment Form (Employability Re-assessment Form) indicating that Plaintiff was "permanently disabled," however, whether Plaintiff is disabled is an issue reserved for the Commissioner.  (Pl.'s Am. Br., ECF No. 16, at 10; *see also* 20 C.F.R. § 404.1520b(c)(3)).

   [7]  Plaintiff incorrectly asserts that the ALJ found that he has only a mild limitation in this area.  (Pl.'s Am. Br., ECF No. 16, at 10).

interaction and occasional interaction with co-workers and supervisors." (R. 39). Moreover, the record contains other evidence, in addition to Plaintiff's doctoral studies, supporting the ALJ's conclusion. For example, although Plaintiff complained of an inability to focus in March 2016 and May 2017, and in his September 2017 Adult Function Report he indicated that he can pay attention for only 20 seconds on "dumb stuff," the ALJ pointed out that in that same Report Plaintiff stated an ability to pay attention for three hours on "intelligent things." (R. 32, 425, 992). The ALJ further observed that at Plaintiff's consultative examination a month later his attention and concentration were intact, and he was able to count down correctly by sevens and threes. (R. 32, 861).

Substantial evidence also supports the ALJ's conclusion that Plaintiff has a mild limitation in adapting or managing himself. Plaintiff points out that he has difficulty typing, cooking and maneuvering his grocery cart (that he purchased because he cannot carry bags) and argues that his participation "in a slowed educational program" and ability to "take public transport occasionally" does not indicate that he has only mild limitations in this area. (Pl.'s Am. Br., ECF No. 16, at 11). However, as the ALJ observed, Plaintiff engages in a host of other activities, including engaging in personal care, meditating and praying, riding his spin bike, taking walks, watching television, preparing and eating meals, checking emails, making phone calls, applying for work, interviewing, conducting research, designing projects and proposals, studying, writing papers and religious treatises, caring for his nephew, carrying out routine household chores and repairs, driving occasionally, and managing his finances. (R. 32-34, 36, 421-24). Further, the proper standard of review is not whether any evidence exists that might support Plaintiff's position, but instead, whether substantial evidence supports the ALJ's decision. *See Stover v. Colvin*, No. 12–531, 2013 WL 2446469 at *3, (W.D. Pa. June 5, 2013) (citing *Allen v. Bowen*, 881 F.2d 37, 39 (3d Cir. 1989)).

Plaintiff also challenges the ALJ's finding that his mental disorder did not meet the paragraph "C" criteria.  A claimant may satisfy the "C" criteria of Listings 12.04, 12.06 or 12.15 by showing that the claimant's mental disorder is "serious and persistent;" that is, that the claimant has a medically documented history of the existence of the disorder over a period of two years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder, and (2) marginal adjustment; that is, minimal capacity to adapt to changes in the environment or to demands that are not already part of the claimant's daily life.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C), 12.15(C).  As set forth in Section 12.00(G)(2)(c):

> The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00G(2)(c).

Plaintiff maintains that the ALJ erred in finding that his mental impairment was not "serious and persistent" on the bases that he had never been hospitalized or taken medication for psychiatric reasons and "that Plaintiff is a graduate student that [sic] occasionally lives with his college-aged nephew."  (Pl.'s Am. Br., ECF No. 16, at 12).  He points to his January 2015 Penn

21

Care Internal Medicine records noting anxiety, PTSD, rage attacks and excessive anger, as well

records indicating counseling for these conditions at Life Counseling Services and the Military

Family Clinic of the University of Pennsylvania.  (*Id.* at 12-13).  But the ALJ acknowledged

these diagnoses and the related treatment in her decision.  (R. 33).  However, she also considered

Plaintiff's consistently normal affect, judgment and insight.  (R. 33, 36, 693, 701, 705, 709, 713,

717, 721, 725, 729).  In addition, Plaintiff has not merely attended graduate school or

"occasionally live[d] with his college-aged nephew," as Plaintiff submits, but, as noted by the

ALJ, he has instead shown substantial progress toward his doctorate – having completed all

coursework and examinations for it and begun his dissertation – and served as his nephew's legal

guardian since he was a child.  (R. 32-34, 36, 752, 951, 994).  In addition, the ALJ noted that

Plaintiff served on the board of a nonprofit entity for a few months in 2018.  (R. 32-33, 36, 1084,

1089, 1105, 1115).  Accordingly, substantial evidence supports the ALJ's determination that

Plaintiff failed to satisfy the paragraph "C" criteria.

For these reasons, I find the ALJ's step three analysis was substantially supported by the

evidence and deny Plaintiff's request for remand on this basis.

**B.      RFC – Medium Work**

After the step three listings determination, an ALJ must make an RFC assessment before

moving to steps four and five of the disability evaluation.  *See* 20 C.F.R. § 404.1520(a)(4);

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  An RFC assessment

determines "what an individual can do in a work setting in spite of the functional limitations and

environmental restrictions imposed by all of his or her medically determinable impairment(s)."

SSR 83-10, 1983 WL 31251, at *7.  The ALJ must include all credibly established limitations in

the RFC.  *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*,

829 F.2d 1269, 1276 (3d Cir. 1987)).  Ultimately, the ALJ makes the RFC and disability

determinations.  *Chandler*, 667 F.3d at 361.  Here, the ALJ found:

> the claimant has the residual functional capacity to perform
> medium work as defined in 20 CFR 404.1567(c) [i.e., involving
> lifting no more than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds], except that he can
> frequently balance, stoop, kneel, crouch, crawl, and climb ramps
> and stairs. He can never climb ladders, ropes, or scaffolds. The
> claimant must avoid frequent exposure to hazards including
> moving machinery and unprotected heights. He is limited to
> unskilled work with routine and repetitive tasks performed in a
> low-stress environment (defined as no frequent changes in the
> work setting) with no public interaction and occasional interaction
> with co-workers and supervisors.

(R. 33).

Plaintiff makes two distinct arguments regarding the ALJ's determination that he can

perform medium work.  First, he contends that the ALJ failed to account for his non-severe

impairments of a back disorder and carpal tunnel syndrome.  (Pl.'s Am. Br., ECF No. 16, at 12-

13).  Second, he claims that the ALJ erred in not considering certain evidence that he submitted

within five days of his hearing.  (*Id.* at 13-15).

### 1.    Non-severe Impairments

An ALJ must consider all a claimant's medically determinable impairments in assessing a

claimant's RFC, including impairments that are not severe.  20 C.F.R. § 404.1545; *Rutherford v.*

*Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005).  Plaintiff argues that the ALJ improperly concluded

that his back problems and carpal tunnel warranted no more than minimal work-related

limitations, even though they cause him difficulties in holding and carrying objects, maneuvering

his grocery cart, typing, cooking, standing for over two hours or bending.  (Pl.'s Am. Br., ECF

No. 16, at 12-13).  However, substantial evidence supports the ALJ's conclusion.  As the ALJ

observed, despite these impairments, Plaintiff has exercised "regularly" and "vigorously," and

often a "daily" basis, throughout much of the period of alleged disability.  (R. 35, 36, 38).  This

exercise included going for walks, riding a spin bike (often several times per week), lifting

weights and doing crunches and body twists.  (R. 36, 421-24, 686, 691, 704, 752, 770).  When

Plaintiff first reported his back pain to Dr. Palecek in April 2018, he described it as a "flare[ ]

up" and denied that it bothered him during exercise.  (R. 941).  Dr. Palecek determined that the

condition presented "no red flags" but sent Plaintiff to physical therapy, which improved his

symptoms.  (R. 942, 985).

The record reveals that Plaintiff also did not report symptoms of carpal tunnel until April

2018.  (R. 941).  He complained at that time that he had tingling in both arms, positional in

nature and worse when raising his arms or carrying something heavy, but that the sensation

would improve with lowering his arms or moving the heavy item to his other hand.  (R. 941).

Upon examination, he had no signs of weakness in his arms or grip strength.  (R. 942-43).  The

ALJ noted that in June 2018 tests revealed "moderate" carpal tunnel but were "otherwise

normal."  (R. 30, 944, 948, 951).  Dr. Palecek prescribed wrist braces, and Plaintiff did not

thereafter complain about his symptoms.  (R. 951).

Thus, substantial evidence supports the ALJ's determination that Plaintiff is capable of

performing medium work and otherwise working consistent with his RFC, notwithstanding his

back disorder and carpal tunnel.

### 2.    Allegedly Disregarded Evidence

An ALJ must consider all relevant evidence when determining a claimant's RFC,

including "medical records, observations made during formal medical examinations, descriptions

of limitations by the claimant and others, and observations of the claimant's limitations by

others." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001).  However, if the claimant fails

to submit or inform the ALJ about written evidence at least five days before the hearing, the ALJ

may refuse to consider or obtain the evidence, subject to certain exceptions not present here.  20

C.F.R. § 404.935(a)-(b).  Here, Plaintiff claims that the ALJ failed to consider five pieces of

evidence on the basis that they were not submitted five or more days in advance of the hearing:

(1) prior medical files; (2) a February 20, 2015 letter from Dr. Palecek; (3) a May 23, 2017

Employability Re-assessment Form completed by Dr. Palecek; (4) a July 30, 2019 letter from

Plaintiff's psychotherapist, Carmen Valls; and (5) a July 16, 2019 narrative letter from Plaintiff

addressed to the Office of Appellate Operations.  (Pl.'s Am. Br., ECF No. 16, at 14).  In fact,

Plaintiff only attempted to submit the first three pieces of evidence to the ALJ.

First, Plaintiff is mistaken that his prior medical files were excluded under the five-day

rule.  These files were made a part of the record, as the ALJ remarked.  (R. 38, 456-639).  The

ALJ considered these records "for background purposes only, as that fi[l]e is not being

reopened."  (R. 27).  There was nothing improper about this treatment of Plaintiff's medical files

from his prior, closed claim, and, in fact, the ALJ considered these records as appropriate.  (*See*

R. 33 (discussing psychotherapy at Life Counseling Services)).

Nor were the letter and Employability Re-assessment Form excluded.  The letter is part

of the prior medical files, and the form is included at the end of the record.  (R. 530, 1160-61).

However, neither constitutes a medical opinion requiring the ALJ's consideration.  In the letter,

Dr. Palecek stated that Plaintiff could not return to his job at the school district, and in the form

he checked a box indicating that Plaintiff is "permanently disabled."  (R. 530, 1160-61).  But

because the issue of a claimant's ability to work or disability status is reserved to the

Commissioner, such evidence is "inherently neither valuable nor persuasive," and thus the ALJ

does "not provide any analysis" in his or her decision about how such evidence was considered.

20 C.F.R. § 404.1520b(c)(3)(i).

The other two pieces of evidence, the Valls letter and Plaintiff's narrative, were

submitted after the hearing to the Appeals Council.  (Resp., ECF No. 17, at 22).  It has long been

the rule in this Circuit that "evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence." *Matthews v. Apfel*, 239 F.3d 589, 594 (3d. Cir.2001) (*citing Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991)).  In some limited circumstances, however, a reviewing court may remand a case under sentence six of 42 U.S.C. § 405(g) for reconsideration of the decision in light of new and material evidence submitted.  *Id*. at 591-595.  The sixth sentence of 42 U.S.C. § 405(g) provides that the district court may remand a social security appeal to the Commissioner for consideration of new evidence where the plaintiff has shown that the "new evidence" is "material" and that "there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."  *See* 42 U.S.C. § 405(g).  To be "new," evidence cannot be "merely cumulative of what is already in the record."  *Szubak v. Sec'y of Health & Hum. Servs*., 745 F.2d 831, 833 (3d Cir.1984).  And evidence is "material" if there is a "reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination."  *Id*.

The Valls letter and Plaintiff's narrative were neither new nor material.  The letter, which is just over a page long, indicated that Plaintiff had continued intrusive thoughts, disorganized speech, periods of disassociation and easily triggered symptoms, and that he was "unable to process memories toward the resolution of symptoms."  (R. 9).  But it also noted that his condition was stable, that he did not take psychotropic medication, that he had been able to "gain insight and learn skills" through cognitive therapy techniques, and that he was able "to manage his symptoms so that he can function to complete his ADL's [activities of daily living], an exercise routine and dissertation work."  (R. 9).  Accordingly, the letter is cumulative of other evidence in the record, and it is not reasonably probable that it would have changed Plaintiff's disability determination.  (*See, e.g.,* R. 100, 412, 421-24, 686, 691, 704, 750, 752, 770, 836-41, 864, 951, 1069, 1100).

Plaintiff's narrative is a chart listing "event[s]/incident[s]" since 1967 through some point in 2019[8] that have triggered an "issue/situation" of "flare-ups" of symptoms and what "action/aftercare plan" Plaintiff implemented to address the return of symptoms.  (R. 447-55). As an initial matter, Plaintiff has failed to show good cause why this document, which pertains primarily if not exclusively to the period before his administrative hearing, was not presented in advance of his hearing.  In addition, the narrative does not constitute "new" evidence because it is primarily concerned with recounting recurrences of his symptoms and the use of his cognitive therapies and other strategies to deal with them.  (R. 447-55).  For this reason, and due to the questionable relevance of much of the information in the document, it is also not reasonably probable to change his disability determination.  Thus, it does not serve as a basis for remand.

Because the ALJ properly considered Plaintiff's non-severe impairments, and because no evidence was improperly excluded, the Court declines to remand this matter on the basis that the ALJ erred in determining that Plaintiff has the RFC to perform medium work.

### C.    Allegedly Inconsistent Opinions

Lastly, Plaintiff maintains that the ALJ erred by crediting allegedly inconsistent opinions. First, he argues that Dr. Dzurinko's opinion was not consistent with the record and the ALJ therefore should not have accepted it.  (Pl.'s Am. Br., ECF No. 16, at 15-16).  Next, he contends that the ALJ should not have relied upon the VE's testimony because it was inconsistent with information in the Dictionary of Occupational Titles.  (*Id.* at 16-17).

### 1.    Dr. Dzurinko's Opinion

Plaintiff complains that the ALJ found Dr. Dzurinko's opinion "mostly persuasive"

---

[8]  The document is dated July 16, 2019, but the dates of individual incidents are not given.  (R. 447-55).

overall, notwithstanding the latter's conclusion that Plaintiff could perform work at a "heavy exertion level." (*Id.* at 15). He posits that his "simple exercises" were insufficient to undercut "the stack of evidence showing that he is severely disabled," including his treating physician's determination that he is permanently disabled and other evidence showing that he has difficulty "confidently holding most objects" and that he "pass[es] out after reading for two hours." (*Id.*). According to Plaintiff, he "is not a man that [sic] can perform 'heavy exertion' work, and it is unimaginable how Dr. Dzurinko could have come to this conclusion." (*Id.* at 16).

However, as Plaintiff acknowledges, the ALJ agreed that this portion of Dr. Dzurinko's assessment was "somewhat inconsistent" with the record evidence, and, accordingly, she rejected it in her determination that Plaintiff has the RFC to perform only "medium" work. (*Id.*; R. 33). She further determined that "the remaining limitations [described by Dr. Dzurinko] are largely consistent with the overall medical evidence of record, particularly the claimant's reported exercise." (R. 38). This determination is backed by substantial evidence. As noted, the ALJ observed that Plaintiff has exercised "regularly," "vigorously," and often "daily." (R. 35, 36, 38). During the period of alleged disability, he took walks, rode a spin bike, lifted weights and performed crunches and body twists. (R. 421-24, 686, 691, 704, 752, 770). Plaintiff's treating physician's finding that he is "disabled" changes nothing, as that issue is reserved to the Commissioner. 20 C.F.R. § 404.1520b(c)(3)(i). Nor was the ALJ required to discount the non-exertional limitations found by Dr. Dzurinko simply because Plaintiff has trouble holding items with confidence or reading for more than two hours without passing out. *See Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014) ("the ALJ is free to accept some medical evidence and reject other evidence, provided that he provides an explanation for discrediting the rejected evidence") (*Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006)). Thus, the Court will not remand this

matter on the basis that the ALJ credited that portion of Dr. Dzurinko's opinion addressing

Plaintiff's non-exertional limitations.

### 2.   VE's Testimony

In steps four and five of a disability determination, a VE "may offer expert opinion

testimony in response to a hypothetical question about whether a person with the physical and

mental limitations imposed by the claimant's medical impairment(s) can meet the demands of

the claimant's previous work, either as the claimant actually performed it or as generally

performed in the national economy."  20 C.F.R. § 416.960(b)(2).  The purpose of posing a

hypothetical is to determine whether a claimant has the RFC to perform either the claimant's

previous work or any work that exists in the national economy.  *Ramirez v. Barnhart*, 372 F.3d

546, 549 (3d Cir. 2004).  The ALJ's hypothetical "must accurately convey to the [VE] all of a

claimant's credibly established limitations" in order to rely upon the VE's testimony as

substantial evidence.  *Rutherford*, 399 F.3d at 554.

If a conflict arises between the VE's testimony and the Dictionary of Occupational Titles

(DOT),[9] the ALJ "must elicit a reasonable explanation for the conflict."  SSR 00-4p.  The Third

Circuit has explained that when a conflict arises,

> [A]n ALJ is required to (1) ask, on the record, whether the VE's
> testimony is consistent with the DOT, (2) "elicit a reasonable
> explanation" where an inconsistency does appear, and (3) explain in
> its decision "how the conflict was resolved."

*Zirnsak v. Colvin*, 777 F.3d 607, 617 (3d Cir. 2014) (quoting *Burns v. Barnhart*, 312 F.3d 113,

127 (3d Cir. 2002)).  Failure to follow these steps "may warrant remand in a particular case."  *Id.*

---

[9]  The DOT is "a publication of the United States Department of Labor that contains
descriptions of the requirements for thousands of jobs that exist in the national economy, in order
to determine whether any jobs exist that a claimant can perform."  *Burns v. Barnhart*, 312 F.3d
113, 119 (3d Cir. 2002).

(citing *Rutherford*, 399 F.3d at 557).  However, "the presence of inconsistencies does not *mandate* remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'"  *Id.* (citations omitted) (emphasis in original).

Here, Plaintiff insists that the ALJ should not have relied upon the VE's testimony that there exist in significant numbers in the national economy jobs fitting the ALJ's restriction that he can only work "in a low-stress environment (defined as no frequent changes in the work setting) with no public interaction and occasional interaction with co-workers and supervisors" because the testimony is inconsistent with the DOT insofar as it does not define "low-stress." (Pl.'s Am. Br., ECF No. 16, at 16 (quoting R. 40)).  According to Plaintiff, this restriction "would be an integral aspect of any employment," assuming he is not found fully disabled.  (*Id.*). He claims that his impairments "caused issues in every aspect of his employment" previously and points to his headaches, pulse in his ears, blurred vision, shaking, anger outbursts and blackouts.  (*Id.* at 16-17).  He also refutes that his treatment notes show lasting improvement because the notes from his final two visits with Dr. Smith reference "significant distress and struggle" followed by three blackouts due to a records request associated with this claim not being processed.  (*Id.*).

A review of the hearing transcript and decision confirms that the ALJ followed the prescribed three-step process for reconciling the VE's testimony with the DOT.  *See Zirnsak*, 777 F.3d at 617.  At steps one and two, she questioned the VE about whether his testimony regarding the availability of "low-stress" jobs was consistent with the DOT and elicited a reasonable explanation on that point:

> Q: And, again, is that consistent with the Dictionary of Occupational Titles?
>
> A: Well, the Dictionary of Occupational Titles doesn't really reference aspects of jobs in terms of like low stress, but in, in

general the jobs that are SVP 1 or 2 because of their nature, they're jobs that can be learned, in some cases, by no more than a simple demonstration the first day of work and it just doesn't change after that or, in the case of the hand packager, up to 30 days of on-the-job training. Just by their, their nature they're – they really don't have any decision-making – independent decision-making. You know, as long as you're present and productive to the standards of unskilled employment, you're going to maintain your job. So, although not worded exactly the way you referenced in the RFC, in my opinion, unskilled occupations do fit the the, the elements offered in the RFC.

Q: And they wouldn't have more than frequent changes in the work setting?

A: No, they really don't change at all.

(R. 110).

At step three, the ALJ explained how she resolved the conflict between the VE's

testimony regarding "low-stress" jobs and the absence of that term in the DOT:

Although the vocational expert's testimony is inconsistent with the information contained in the *Dictionary of Occupational Titles*, there is a reasonable explanation for the discrepancy. The vocational expert testified that the *Dictionary of Occupational Titles* does not address "low stress," but, in general, jobs can be learned by simple demonstration and the jobs cited satisfy the hypothetical, which defined low stress. The vocational expert testified that the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations* address dealing with people, and none of these jobs have that element. He further explained that dealing with the public is not an element of these jobs, based on his experience and the worker might be set up in an isolated environment.

(R. 40).

Thus, contrary to Plaintiff's assertions, this "integral aspect" of his prospective

employment was not treated "as an optional or throwaway" component of his RFC.  (Pl.'s Am.

Br., ECF No. 16, at 16-17).  As set forth in Plaintiff's narrative and elsewhere, Plaintiff's

symptoms are generally triggered by stressful "issues" and "situations," but the ALJ tailored his

RFC to "low-stress" environments to avoid these triggers.  (R. 33, 39, 447-55, 992, 1069, 1105, 1120).  Similarly, substantial evidence supports the ALJ's determination that Plaintiff's medical records show that his mental health was improving.  As the ALJ explained, Plaintiff presented to Dr. Palecek with stress-related headaches in January 2014, but they "improv[ed]" from February to May 2014 and had ceased by June 2014.  (R. 34, 821, 824, 834, 836).  She also noted that Plaintiff had a single headache in August 2014 after his psychotherapist discussed his returning to work, but that his 2015 and 2016 treatment notes either make little mention of headaches or otherwise indicate "no issues with headaches."  (R. 34, 720, 722, 724, 726, 728, 786, 788, 790, 792, 798-99).  Further, although Plaintiff experienced a recurrence of symptoms in August 2018, the month that his final regularly scheduled visits with Dr. Smith took place, due largely to the stressful incident involving his failed records request, in the prior month's visits he reported doing "better . . . overall" despite ongoing stress, and Dr. Smith observed that he was "trending toward improvement" after changing therapy types.  (R. 1100).  During these August visits, notwithstanding his return of symptoms, Plaintiff nonetheless showed "improved ability to defuse from unwanted thoughts, feelings, and memories[,] and he reported enhanced quality" of actions taken regarding his physical health and learning goals.  (R. 1120).

Because the ALJ correctly applied the three-step process for addressing the conflict between the VE's testimony and the DOT, and because the ALJ's step five determination is otherwise supported by substantial evidence, the Court will not remand this matter based upon any purported issues with the VE's testimony.

## VI.  CONCLUSION

For the reasons set forth above, I find that the ALJ's findings are supported by substantial evidence.  Accordingly, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski          
LYNNE A. SITARSKI
United States Magistrate Judge